# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### (Greenbelt Division)

| | |
|---|---|
| *In re:* | |
| | Case No. 20-10691-TJC |
| ZACHAIR, LTD., | |
| | Chapter 11 |
| Reorganized Debtor. | |
| | |
| LAWRENCE A. KATZ, Plan Administrator for the Bankruptcy Estate of Zachair, Ltd., CONFIDENTIAL COMMUNICATION | |
| Plaintiff, | |
| | Adv. Proc. No. 23-00014 |
| v. | |
| DR. NABIL J. ASTERBADI, *et al.* | |
| Defendants. | |

## <u>DECLARATION OF BRADFORD F. ENGLANDER</u>

1.      I am a partner in the law firm Whiteford, Taylor & Preston, LLP ("Whiteford"), which represented Zachair, Ltd. ("Zachair" or the "Debtor") in connection with its chapter 11 bankruptcy case (the "Bankruptcy Case") in this Court.

2.      Zachair is a Maryland corporation owned by Nabil Asterbadi ("Dr. Asterbadi") and his wife, Maureen Asterbadi ("Mrs. Asterbadi"). As of the filing of the Debtor's chapter 11 petition, Dr. and Mrs. Asterbadi were the two directors of Zachair.

3.      In the course of Whiteford's representation of the Debtor, I communicated primarily with Dr. Asterbadi and his counsel about matters involving the Debtor. Although Dr. Asterbadi was my primary point of contact with the Debtor, Whiteford did not represent Dr. Asterbadi. During the pendency of the Bankruptcy Case, Dr. Asterbadi was represented by

his personal counsel.  During the period from November 2021 through September 2022, Dr. Asterbadi was represented by Jeffrey Tarkenton of Womble, Bond Dickinson (US) LLP.  It is my understanding that Mr. Tarkenton also represented Mrs. Asterbadi in various matters in connection with the Bankruptcy Case.  I do not recall having any direct conversations with Mrs. Asterbadi during the entire Bankruptcy Case.

4.      The Petition for Zachair was filed on January 17, 2020.  Zachair was forced to file its Petition largely due to a lawsuit that had been filed against Zachair by PD Hyde Field LLC. That litigation was settled by a settlement agreement dated September 8, 2021, under which, among other terms, PD Hyde Field LLC received an allowed unsecured claim in the Bankruptcy Case in the amount of $3.2 million.

5.      On September 7, 2021, the Debtor filed its First Amended Plan of Reorganization. That First Amended Plan proposed that funds to pay creditors would be generated by the sale of Zachair's real property pursuant to a contract (the "Sale Contract") between Zachair and JP Land Holdings, LLC ("Purchaser").

6.      The purchase price under the Sale Contract was $16 million, subject to adjustments ("Purchase Price").  Closing under the Sale Contract was conditioned upon completion of Purchaser's due diligence, satisfactory to Purchaser in its sole discretion.  At that Purchase Price, subject to satisfaction of all conditions and occurrence of closing under the Sale Contract, the sale proceeds were projected to be sufficient to pay in full all allowable claims of Zachair's creditors.  Because full payment of creditors was projected at the time of filing of the First Amended Plan, the First Amended Plan proposed to release all Avoidance Actions that were available to Zachair.  The Avoidance Actions included potential claims for avoidance and recovery of preferential and fraudulent transfers under sections 547 and 548 of the Bankruptcy

Code.  The principal potential targets of the Avoidance Actions were Dr. and Mrs. Asterbadi,

their family, and various entities to whom the Debtor made payments, even though the Debtor

was not indebted to such entities and received no benefit from the goods, services or loans that

they may have provided to the Asterbadis.  The proposed release was feasible because creditors

would not have benefitted from the prosecution of Avoidance Actions had the sale of the

property occurred at the Purchase Price and permitted payment in full of all creditor claims from

the projected sale proceeds.

7.      By November 2021, the Sale Contract had been amended to allow the Purchaser

to conduct further due diligence.  On or about November 10, 2021, as part of its due diligence

investigation, the Purchaser met with representatives of the Prince George's County Department

of Permitting, Inspections and Enforcement ("DPIE").  Shortly following such meeting,

Purchaser's representative informed me that at that meeting, the representatives of DPIE told the

Purchaser that DPIE would not grant permits for construction of single-family residential units

on large portions of the Debtor's property that was burdened by fill dirt, which Dr. Asterbadi had

caused to be deposited on the property.  The acceptance of fill dirt was the source of substantial

revenues that funded the payments to and for the benefit of Dr. and Mrs. Asterbadi and other

relatives and insiders.  DPIE's position cast serious doubt about Purchaser's ability to develop

large portions of the property for residential use.  These doubts raised concerns about the

economic viability of Purchaser's development plans and, thus, created serious concerns about

the Purchaser's willingness to proceed under the Sale Contract at the agreed Purchase Price, or at

all.

8.      In an effort to preserve the proposed sale to Purchaser, the Debtor agreed to a

third amendment to the Sale Contract to extend the Purchaser's study period.  Before this

3

extension, the study period was set to expire on November 14, 2021. Under the third amendment

to the Sale Contract, the study period was extended to December 15, 2021. Since the Purchaser

had not successfully completed its due diligence at the time originally scheduled for the hearing

on confirmation of the First Amended Plan, the Debtor requested an adjournment of the hearing

date on confirmation of the Plan. Initially, the Court had set a hearing to consider confirmation

of the First Amended Plan for November 30, 2021. On November 29, 2021, on the Debtor's

motion, the Court continued the hearing to a date to be determined.

9.    The issues raised by DPIE, the extension of the study period under the Sale

Contract and the indefinite continuation of the hearing on the First Amended Plan occurred less

than two months before the two-year anniversary of the Petition Date, January 17, 2022. Under

section 546 of the Bankruptcy Code, the Debtor would have had to file complaints commencing

the Avoidance Actions within two years following the Petition Date. Under the circumstances, it

was unclear whether the Debtor would be able to sell the property for a price that would be

sufficient to pay all creditors in full. Consequently, the assumption underlying the First

Amended Plan's proposal to release Avoidance Actions became questionable. If the sale did not

proceed substantially as previously negotiated and set forth in the Sale Contract, pursuit of the

Avoidance Actions may have been necessary to provide for the payment of creditor claims.

10.    In light of these circumstances, to ensure that the Debtor was taking appropriate

action to preserve estate assets, I had several discussions with Dr. Asterbadi during which I

reminded him of his fiduciary duties as a director of the Debtor, and his and the Debtor's

fiduciary duties to creditors, with respect to the need to preserve assets of the estate, specifically

the Avoidance Actions. I advised him to authorize Whiteford to seek tolling agreements from

potential targets of the Avoidance Actions and, if the targets did not agree to sign tolling

4

agreements, to authorize Whiteford to file complaints against them. I also informed him that if filing of complaints was needed, we could minimize expense by seeking orders staying proceedings on such complaints pending resolution of the sale of the property and confirmation of a plan that might release the Avoidance Action claims.

11.     Despite the impending two-year deadline for the Debtor to take action, Dr. Asterbadi refused to authorize Whiteford to seek tolling agreements or to file complaints against targets of the Avoidance Actions. I urged Dr. Asterbadi to seek tolling agreements from his family (and to sign one himself). Dr. Asterbadi refused, explaining that he and they had done nothing wrong, and that a request to sign a tolling agreement would surprise some of his family members, who were unaware that they were exposed to liability on account of the Debtor's bankruptcy. The Debtor, through Dr. Asterbadi, rejected Whiteford's advice with respect to preservation of claims of the estate.

12.     As time passed and the two-year anniversary of the case grew closer, I and others at Whiteford became increasingly concerned that the Debtor's rejection of our advice created an untenable situation. In essence, by rejecting advice of counsel, the Debtor created a circumstance in which, absent alternative action, the Avoidance Actions might have expired by operation of law, without disclosure to, or approval of, creditors or the Court.

13.     I and my colleagues tried to come up with a fallback solution that might be acceptable to Dr. Asterbadi and at least ensure full disclosure to the Court and creditors, and provide an opportunity for assertion of the Avoidance Actions prior to the two-year deadline. The fallback solution was to prepare a detailed notice of abandonment pursuant to Bankruptcy Code section 554 and Bankruptcy Rule 6007.

14.     We discussed the Avoidance Actions, the Debtor's duties, the fiduciary duties of the Debtor's directors, and the proposed fallback approach of abandoning the claims with Dr. Asterbadi and his personal counsel.

15.     To facilitate our discussions, Whiteford provided summaries of payments comprising a portion of the Avoidance Actions to Dr. Asterbadi and his personal counsel:

**Total Payments to or For the Benefit of Insiders of
Zachair, Ltd. Within 2 Years of the Petition Date**

| Insider | Payments to or for the benefit of Insider |
|---|---|
| Maureen Asterbadi | $181,115.75 |
| Nabil Asterbadi | $800,045.05 |
| Joint Maureen and Nabil Asterbadi | $264,307.99 |
| S. Asterbadi (sister of Nabil Asterbadi) | $42,764.45 |
| Marc and Mary Doctors (sister and brother-in-law of Maureen Asterbadi) | $186,176.29 |
| **Total:** | **$1,477,804.36** |

16.     Whiteford identified the following payments that Zachair had made to these recipients within two years of the Petition Date to non-insider transferees:

**Total Payments to Non-Insider Transferees Within 2 Years of the Petition Date For Which No Corresponding Value Was Received by the Debtor**

| Non-Insider Transferee | Total Transfers |
|---|---|
| American Express | $183,197.62 |
| Bank of America Card Services | $67,100.55 |
| Barclaycard | $28,767.31 |
| Capital Investment & Development | $10,000.00 |
| Chase | $65,577.38 |
| Cincinnati Life Insurance | $46,252.36 |
| Citi Mortgage | $219,555.23 |
| D.C. Treasury | $7,939.65 |
| David Lamb, Esq. | $12,000.00 |
| Discover | $12,689.25 |
| Fransesca Wong | $41,000.00 |
| Holston MacDonald | $16,410.00 |
| Meyers Rodbell Rosenbaum | $10,000.00 |
| Toyota Financial Services/Toyota Motor Credit | $17,280.47 |
| United States Treasury | $215,073.40 |
| Total: | $952,843.22 |

17.     Each of the recipients listed in the charts above was a potential defendant to an Avoidance Action by the Debtor. Also, under Maryland law the Debtor had claims against other transferees that had taken place within three years of the Petition Date. Whiteford did not quantify the amount the transfers occurring between two and three years prior to the Petition Date. Those "three year" transfers also were within the meaning of Avoidance Action.

18.     I continued to pursue this matter with Dr. Asterbadi and his personal counsel. In the late afternoon of December 20, 2021 I held a call with Dr. Asterbadi and Mr. Tarkenton to discuss these matters. In advance of the call I sent to Dr. Asterbadi and Mr. Tarkenton the two charts of transferees presented above.

19.     Also in advance of the December 20, 2021 telephone call, I prepared an outline relating to the Debtor's fiduciary duties and the potential Avoidance Actions. A copy of that outline is attached as Exhibit A. I generally followed this outline in my remarks during the call,

7

and after the call I sent a copy of this outline to Mr. Tarkenton. This outline was prepared after Dr. Asterbadi had made it clear that, contrary to my advice, he did not authorize Whiteford to pursue tolling agreements or to file Avoidance Actions on the Debtor's behalf. Recognizing that Dr. Asterbadi had rejected my advice regarding tolling agreements and filing complaints, the outline summarizes our fallback recommendation to file a notice of abandonment of the Avoidance Actions.

20.    After several discussions among myself, my colleagues, Dr. Asterbadi and his personal counsel, Dr. Asterbadi authorized Whiteford to file the Notice of Abandonment, which was filed on December 22, 2021 and appears as Docket Entry No. 301 in Zachair's Chapter 11 case.

21.    The Notice of Abandonment stated that the transfers that were potentially subject to avoidance were those identified in the responses to questions 3, 4 and 13 on the attachments to the Debtor's Statement of Financial Affairs, which was Docket Entry No. 29 in Zachair's Chapter 11 case, as well as other transfers that had been made within three years of the Petition Date. Those attachments to the Statement of Financial Affairs list all of the transferees identified in the charts above, among others.

22.    As can be seen by the certificate of service on the Notice of Abandonment, I caused the Notice to be mailed to Mrs. Asterbadi and others on December 22, 2021. Mrs. Asterbadi was on our service list for all major pleadings in the case.

23.    The Notice of Abandonment required any person who objected to the abandonment of the Avoidance Actions to file and serve an objection within 14 days. No interested party filed or served an objection to the abandonment within that 14-day deadline.

8

The Court did not hold a hearing with respect to the abandonment, nor did it enter an order confirming the abandonment. *See* Fed. R. Bankr. 6007(a).

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 15, 2023.

Bradford E. Englander

16658635.4  047938.00001

9

# EXHIBIT A

In re Zachair Ltd.

BFE notes re potential fraudulent transfer actions

December 20, 2021

PRIVILEGED AND CONFIDENTIAL
ATTORNEY/CLIENT COMMUNICATION
ATTORNEY WORK PRODUCT

1. Deadline

    a. Section 546 requires filing actions within 2 years following order for relief (i.e., petition date.

    b. Petition date was January 17, 2020.

    c. Deadline (under some caselaw) is January 16, 2022.

2. Duties

    a. Debtor is a fiduciary for creditors and must act to protect assets of estate.

3. Nature of Available Information.

    a. Preliminary analysis.

    b. Further review needed should commencement of actions be approved.

    c. Further determination needed with respect to cut off date for determining which, if any, transfers are subject to avoidance.

    d. No information has been developed regarding 3-year transfers.

4. Preference actions.

    a. Preference actions, whether 90 days or one year, require showing of balance sheet insolvency.  Evidence (particularly Bill Harvey appraisal), contradicts finding of balance sheet insolvency.

        i. Total debt asserted as of petition date is approximately $8 million.  That number includes disputed claim of PD Hyde Field.

        ii. Appraised value is $19.3-$22.1 million.  Sale price was proposed at $16 million.

**EXHIBIT A**

PRIVILEGED AND CONFIDENTIAL
ATTORNEY/CLIENT COMMUNICATION
ATTORNEY WORK PRODUCT

    b.  Recommendation: do not pursue preference actions.

5.  Fraudulent transfer actions

    a.  Intent to hinder delay or defraud.

        i.  Transfers made to hinder delay or defraud creditors are actionable, without need to establish debtor's financial condition.

        ii.  Under section 548, transfers going back 2 years prior to petition date are subject to possible avoidance.

        iii.  Under section 544/Maryland law, transfers going back 3 years prior to petition date are subject to possible avoidance.

        iv.  Evidence of intent is lacking

            1.  Payment of personal debt/expenses was routine for many years.

            2.  Insiders funded Debtor expenses from time to time ($559,000 during the 2 years prior to bankruptcy).

            3.  Until March 2020, Debtor had substantial cash flow.

            4.  Debtor generally was paying debts when due.

            5.  Debtor was in litigation, but judgment was not imminent, and debtor did not consider plaintiff's claims to be legitimate.

            6.  No change in Debtor's payment practices in response to litigation.

    b.  Constructive fraudulent transfers

        i.  Transfers made in exchange for less than reasonably equivalent value.

            1.  Value must be given to the Debtor, not an affiliate, insider or other third person.

            2.  All transfers subject to this discussion were made without any value, much less reasonably equivalent value.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY/CLIENT COMMUNICATION
ATTORNEY WORK PRODUCT

      a. Owner distributions are not required and do not provide value to the Debtor.

      b. Payment of debts or expenses of insiders provide no value to the Debtor unless the Debtor was legally obligated with respect to the payments.

      c. We are unaware of any indebtedness by the Debtor with respect to the subject transfers.

3. Financial tests.

      a. Insolvency.

            i. Balance sheet test.

            ii. For reasons stated above, we don't believe a viable case of balance sheet insolvency is likely.

      b. Unreasonably small capital.

            i. Requires finding that the Debtor "was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital." 11 U.S.C. § 548(a)(1)(B)(ii)(II).

            ii. An entity has unreasonably small capital if it lacks the ability to generate sufficient profits to sustain operations.

            iii. Factors that may be relevant in determining whether capital was unreasonably small include the transferor's debt to equity ratio, its historical capital cushion, and the need for working capital in the transferor's industry.

            iv. The debtor's access to credit or financing also can be relevant to assessing capitalization.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY/CLIENT COMMUNICATION
ATTORNEY WORK PRODUCT

    v. Some courts have observed that courts will not find that a company had unreasonably low capital if the company survives for an extended period after the subject transaction.

    vi. Here, factors support and contradict finding of unreasonably small capital.

        1. Factors supporting finding include:

            a. Maturity date of Sandy Spring loan had occurred and note was not paid. Originally 12/11/2018. Extended to 3/11/2019, then to 6/11/2019. [confirm no further extensions.]

            b. Debtor and insiders lacked liquidity to fund PD Hyde Field litigation.

            c. Without resolution of PD litigation or at least elimination of *lis pendens*, Debtor could neither sell nor refinance the property.

            d. Debtor's principals had limited ability to borrow money.

            e. Although no certainty regarding date of cessation of surcharge operation and revenues, Debtor had exceeded maximum fill and order requiring cessation was virtually certain at some point.

        2. Factors contradicting finding include:

            a. Revenues from airport operations were sufficient to pay monthly expenses of

PRIVILEGED AND CONFIDENTIAL
ATTORNEY/CLIENT COMMUNICATION
ATTORNEY WORK PRODUCT

airport operations (assuming all insider draws and payments were terminated). But note that the ordinary operating revenues were not sufficient to pay episodic payments such as real estate taxes, even without owner draws.

b. Sandy Spring was not pursuing remedies.

c. Financial strain on the Debtor was not the result of operating deficits, but of litigation.

d. Debtor had obtained borrowing commitment subject to pledge of insider collateral (e.g., Telford).

c. Cash flow test

    i. Fraudulent transfers may exist when a debtor intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured. 11 U.S.C. § 548(a)(1)(B)(ii)(III).

    ii. This "forward looking" test requires an assessment of the debtor's reasonable prediction about its ability to repay a debt as it is incurred.

    iii. This test is subjective in nature and evaluates the debtor's actual intent or belief that it will incur debt it cannot pay at maturity.

    iv. A court also may consider whether the debtor actually was "able to pay, intended to

PRIVILEGED AND CONFIDENTIAL
ATTORNEY/CLIENT COMMUNICATION
ATTORNEY WORK PRODUCT

         pay, and . . . was paying its debts as they
         came due.

    v. Here, some factors weigh in favor of a
      finding of intent to incur debts, and some
      weigh against a finding.

    vi. Factors in favor of a finding include:

       1. Sandy Spring loan matured in June
         2019 and had been extended twice.

       2. Debtor had to defend PD Hyde
         litigation, but lacked the resources to
         pay lawyers or expert witnesses
         without borrowing from third parties.

       3. Surcharge operations inevitably
         would end.

       4. Debtor engaged bankruptcy counsel
         in June 2019.

       5. Debtor was in default on federal tax
         obligations.

       6. Debtor was paying owner draws and
         insider expenses instead of building
         reserves for the payment of matured
         and maturing obligations.

    vii. Factors weighing against finding include:

       1. Operating expenses of airport were
         being paid, and continued to be paid
         from operating revenues even after
         surcharge revenues terminated.

       2. Cash flow was sufficient to pay owner
         draws.

6. Factors to be considered in connection with decision.

  a. Prospect of equity return in bankruptcy case.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY/CLIENT COMMUNICATION
ATTORNEY WORK PRODUCT

      b. Expense of litigation.

      c. Likelihood of success.

      d. Collectibility.

      e. Distraction caused by litigation.

7. Options.

      a. No action.

          i. Normal in many bankruptcy cases.

          ii. Problematic here because of inherent conflicts of Debtor's management.

      b. Formal motion to abandon assets.

          i. Provides disclosure and minimizes possible accusations based on breach of fiduciary duty.

          ii. Not much time; 15-days for opposition to be filed.

          iii. If objection is filed, action will be needed to preserve causes of action pending resolution of abandonment motion.

          iv. Motion creates implication that case may not be an equity return case.

          v. Motion may cause UST or creditors to seek appointment of trustee.

      c. Tolling agreements.

          i. Feasible with respect to insiders.

          ii. Not feasible with respect to third party targets.

          iii. If insiders decline to sign tolling agreements, suit may be required.

      d. File complaints.

          i. Defer service pending outcome of abandonment motion.

          ii. Settle third party complaints pursuant to 9019 motions.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY/CLIENT COMMUNICATION
ATTORNEY WORK PRODUCT

          iii. Limit complaints to claims exceeding a set threshold (e.g., $20,000) to avoid incurring expense in excess of value of complaint.

8. Recommendation

    a. File abandonment motion

    b. If objection is timely filed, file complaints against third parties and enter tolling agreement with respect to insiders.

*12076922*

# EXHIBIT B

CERTIFICATE OF CORPORATE RESOLUTION

Resolution of the Board of Directors of
ZACHAIR, LTD.
(hereinafter the "Company")

On January 13, 2020, at a meeting of the Board of Directors of the Company, a corporation chartered under the laws of the State of Maryland, and with a principal place of business and address being 2726 Chain Bridge Road, N.W., Washington, D.C. 20016, or by unanimous written consent of the Board of Directors, in accordance with the law and the bylaws of the Company, the following resolution was duly and legally passed and has not been revoked, altered or amended:

WHEREAS, the Board of Directors of the Company has the authority pursuant to Article Seven of the Articles of Incorporation of the Company to designate, from time to time pursuant to a resolution of a majority of the entire Board of Directors, the number of Directors of the Company, provided that so long as there are less than three (3) stockholders, the number of Directors may be less than (3), but not less than the number of stockholders; and

WHEREAS a majority of the Board of Directors has determined that it is desirable and in the best interest of the Company to designate that from the date of execution of this resolution the Company shall have (2) Directors.

NOW, THEREFORE, BE IT RESOLVED, that that from the date of execution of this resolution the Company shall have (2) Directors, to wit: Nabil Asterbadi, 2726 Chain Bridge Road, N.W., Washington, D.C. 20016, and Maureen Asterbadi, 2726 Chainbridge Road, N.W., Washington, D.C. 20016.

This 13th day of January 2020, the Directors of the Company have set their hand adopting the foregoing resolution.

| NAME | TITLE | SIGNATURE |
| --- | --- | --- |
| Nabil Asterbadi | Director and President | |
| Maureen Asterbadi | Director | |

# EXHIBIT C

**Fill in this information to identify the case:**

Debtor 1  Zachair, Ltd.

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court   **District of Maryland**

Case number:  **20−10691**

FILED

**U.S. Bankruptcy Court**
**District of Maryland**

5/26/2020

**Mark A. Neal, Clerk**

## Official Form 410
## Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| **Part 1:** | **Identify the Claim** |
| --- | --- |

**1. Who is the current creditor?**

Maureen Asterbadi

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom?

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Maureen Asterbadi

Name

2726 Chain Bridge Road
Washington, DC 20016

Contact phone      202−253−3222

Contact email

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

Where should payments to the creditor be sent? (if different)

Name

Contact phone

Contact email

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known)          Filed on

MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing?

**Part 2:** Give Information About the Claim as of the Date the Case Was Filed

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ |
| 7. **How much is the claim?** | $ 0.00      **Does this amount include interest or other charges?**<br>     ☑ No<br>     ☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |
| 8. **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br><br>Limit disclosing information that is entitled to privacy, such as healthcare information.<br><br>Indemnification contribution and/or reimbursement |
| 9. **Is all or part of the claim secured?** | ☑ No<br>☐ Yes. The claim is secured by a lien on property.<br>     **Nature of property:**<br>     ☐ Real estate.   If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410–A) with this *Proof of Claim.*<br>     ☐ Motor vehicle<br>     ☐ Other. Describe: _____<br><br>     **Basis for perfection:** _____<br><br>     Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>     **Value of property:**   $ _____<br><br>     **Amount of the claim that is secured:**   $ _____<br><br>     **Amount of the claim that is unsecured:**   $ _____   (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>     **Amount necessary to cure any default as of the date of the petition:**   $ _____<br><br>     **Annual Interest Rate** (when case was filed)   \_\_\_\_\_ %<br><br>     ☐ Fixed<br>     ☐ Variable |
| 10. **Is this claim based on a lease?** | ☑ No<br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____ |
| 11. **Is this claim subject to a right of setoff?** | ☑ No<br>☐ Yes. Identify the property: _____ |

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No ☐ Yes. *Check all that apply:* | Amount entitled to priority |
|---|---|---|---|

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).　$ _____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).　$ _____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).　$ _____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).　$ _____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).　$ _____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(_) that applies　$ _____

* Amounts are subject to adjustment on 4/1/22 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157 and 3571.**

Check the appropriate box:

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  5/26/2020

MM / DD / YYYY

/s/  Maureen Asterbadi

Signature

Print the name of the person who is completing and signing this claim:

Name  Maureen Asterbadi

First name    Middle name    Last name

Title

Company

Address  Identify the corporate servicer as the company if the authorized agent is a servicer

2726 Chain Bridge Road

Number  Street

Washington, DC 20016

City  State  ZIP Code

Contact phone  202–253–3222　　Email

**Fill in this information to identify the case:**

Debtor 1    Zachair, Ltd.

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the: _____ District of Maryland

Case number   20-10691

---

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1:   Identify the Claim

| | |
|---|---|
| **1. Who is the current creditor?** | Maureen Asterbadi <br> Name of the current creditor (the person or entity to be paid for this claim) <br><br> Other names the creditor used with the debtor _____ |
| **2. Has this claim been acquired from someone else?** | ☑ No <br> ☐ Yes. From whom? _____ |

| | | |
|---|---|---|
| **3. Where should notices and payments to the creditor be sent?** <br><br> Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** <br><br> Maureen Asterbadi <br> Name <br> 2726 Chain Bridge Road <br> Number    Street <br> Washington     DC     20016 <br> City      State      ZIP Code <br><br> Contact phone   202-253-3222 <br><br> Contact email _____ <br><br><br> Uniform claim identifier for electronic payments in chapter 13 (if you use one): <br><br> __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ | **Where should payments to the creditor be sent? (if different)** <br><br> Name <br><br> Number    Street <br><br> City      State      ZIP Code <br><br> Contact phone _____ <br><br> Contact email _____ |

| | |
|---|---|
| **4. Does this claim amend one already filed?** | ☑ No <br> ☐ Yes. Claim number on court claims registry (if known) _____     Filed on _____ <br>                                                      MM / DD / YYYY |
| **5. Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No <br> ☐ Yes. Who made the earlier filing? _____ |

**Part 2:** **Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____ |
| 7. **How much is the claim?** | $_____0.00. Does this amount include interest or other charges?<br>☑ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |
| 8. **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br><br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br><br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>See attached addendum. |
| 9. **Is all or part of the claim secured?** | ☑ No<br>☐ Yes. The claim is secured by a lien on property.<br><br>**Nature of property:**<br>☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>**Basis for perfection:** _____<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:** $_____<br>**Amount of the claim that is secured:** $_____<br>**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition:** $_____<br><br>**Annual Interest Rate (when case was filed)** _____%<br>☐ Fixed<br>☐ Variable |
| 10. **Is this claim based on a lease?** | ☑ No<br>☐ Yes. Amount necessary to cure any default as of the date of the petition. $_____ |
| 11. **Is this claim subject to a right of setoff?** | ☑ No<br>☐ Yes. Identify the property: _____ |

| | | |
|---|---|---|
| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ **No** | |
| | ☐ **Yes.** *Check one:* | **Amount entitled to priority** |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

---

## Part 3:  Sign Below

| | |
|---|---|
| The person completing this proof of claim must sign and date it. FRBP 9011(b).<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.<br>18 U.S.C. §§ 152, 157, and 3571. | *Check the appropriate box:*<br><br>☑ I am the creditor.<br>☐ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>Executed on date  5/24/2020<br>                         MM / DD / YYYY<br><br>Signature _Maureen Asterbadi_<br><br>**Print the name of the person who is completing and signing this claim:** |

| | | | |
|---|---|---|---|
| Name | Maureen | | Asterbadi |
| | First name | Middle name | Last name |
| Title | | | |
| Company | | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 2726 Chain Bridge Road | | |
| | Number          Street | | |
| | Washington | DC | 20016 |
| | City | State | ZIP Code |
| Contact phone | 202-253-3222 | Email | |

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND

In re:                                    )
                                          )
Zachair, Ltd.                             )       Case No. 20-10691-TJC
                                          )
          Debtor.                         )       Chapter 11
                                          )

## ADDENDUM TO PROOF OF
## CLAIM OF MAUREEN ASTERBADI

This Addendum is part of the Proof of Claim filed in the chapter 11 case of Zachair, Ltd.

(the "Debtor") by Maureen Asterbadi (the "Claimant").

1.      Pursuant to Section 2 of the By-Laws of Zachair, Ltd., entitled "Indemnification

of Directors and Officers", the Debtor agreed, to the maximum extent permitted by Maryland

Law, to indemnify, and to pay or reimburse reasonable expenses in advance of a final disposition

of a proceeding to any individual who is a present or former director of officer of the

Corporation.

2.      Pursuant to Article Eight of the Articles of Incorporation of Zachair, Ltd., the

Debtor indemnified to the fullest extent permitted by law all officers and directors of the Debtor

all expenses incurred in defending any proceeding to which the officer or director may be a party

and all expenses in satisfying any judgment, order or decree rendered against such officer or

director by reason of their capacity as an officer or director.

3.      By reason of the ByLaws and the Articles of Incorporation, Clamant is entitled to

payment of all expenses incurred in defending any proceeding in which Claimant is a party and

Clamant is entitled to all expenses in satisfying any judgment, order or decree entered against

Claimant by reason of Claimant's capacity as an officer or director.

1

4.      To the extent, if any, that entities assert claims against Claimant that would entitle Claimant to indemnification, contribution or reimbursement under the By-Laws or the Articles of Incorporation, Claimant reserves the right to amend or augment this Proof of Claim to include the expenses incurred in defending and/or satisfying such claims.

5.      Claimant reserves the right to amend or supplement this Proof of Claim.  Without limiting the generality of the foregoing, Claimant reserves the right to specify the amount of damages not yet incurred, ascertained or otherwise specified herein.

6.      Nothing herein constitutes an admission by Claimant that any claim is not entitled to payment as an administrative expense claim in the Chapter 11 case, and Claimant expressly reserves the right to seek payment of any such claim as an administrative expense.

2

# EXHIBIT D



# Transcript of Proceeding

**Date:** October 7, 2022
**Case:** Zachair, Ltd. In Re:

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

1

2

3

4

5

6

7                           PROCEEEDING

8                     IN RE: ZACHAIR, LTD

9                     Potomac, Maryland

10                 Friday, October 7, 2022

11                       10:00 a.m.

12

13

14

15

16

17

18

19

20    Job No.: 466548

21    Pages: 1 - 15

22    Recorded By: Julio Mendieta

Transcript of Proceeding
October 7, 2022                                        2

1        Auction, held at the location of:

2

3

4            FRASER FORBES REAL ESTATE SERVICES

5            7811 Montrose Road, Suite 500

6            Potomac, Maryland 20854

7

8

9

10

11       Pursuant to agreement, before Julio Mendieta,

12    Notary Public in and for the State of Maryland.

13

14

15

16

17

18

19

20

21

22

Transcript of Proceeding
October 7, 2022                                    3

1        A P P E A R A N C E S

2

3    BRADFORD F. ENGLANDER, ESQUIRE

4    BENJAMIN W. JOHANNES

5    MICHAEL D. PARSELS

6    CHRIS JONES

7    JOE CHAZEN

8    BRUCE HENRY

9    PATRICK DONAHUE

10   JENNIFER KNEELAND

11   JOSEPH SELBA

12   DAVID GAFFEY

13   MIKE GROFT

14   NABIL ASTERBADI

15   JESSICA MCMAHON

16   DAVID BOWMAN

17   ERIC BAKER

18   EVAN MEYERS

19   DWIGHT MULES

20

21

22

Transcript of Proceeding
October 7, 2022                                    4

```
1                P R O C E E D I N G S
2                (Whereupon, the court reporter was duly
3      sworn.)
4                MR. ENGLANDER:  All right.  Good morning
5      everybody.  This is Brad Englander.  We are
6      conducting this proceeding this morning pursuant
7      to the Court's bid procedures order and the bid
8      procedures and related matters, and in the
9      exercise of the debtor's fiduciary duties.  For
10     the reasons it will become clear, we do not expect
11     any bids to be presented today.  That means that
12     this proceeding, by and large, is informational,
13     and the proceeding will take place in a hybrid
14     format -- format.  I'm -- I'm located at the
15     offices of Fraser Forbes, the debtor's real estate
16     broker.  With me is Mike Parsels of Fraser Forbes,
17     Ben Johannes of Fraser Forbes, and a court
18     reporter who's transcribing the proceedings.  We
19     are taking notes with respect to the people who
20     have appeared by Zoom.  I don't think we need to
21     get appearances from the people who are named in
22     the Zoom application.  There are two who appear to
```

Transcript of Proceeding
October 7, 2022                                          5

1    be on by phone that do not have names.  I would

2    appreciate if each one of them would identify

3    themselves.  1757?

4           MR. BAKER:  Yeah, that's --

5           MR. GROFT:  Hi, that's Mike.  Mike Groft,

6    Sandy Spring Bank.

7           MR. ENGLANDER:  Okay. Thank you, Mike.

8    And 3280?

9           UNIDENTIFIED SPEAKER:  I -- I believe

10   that's -- we -- we dialed in on a conference line.

11   That's NVR's conference line.

12          MR. ENGLANDER:  Okay, very good.  So we

13   have everybody else.  I can see that Dr. Asterbadi

14   is here.  I believe Joe Selba, who is Dr.

15   Asterbadi's attorney, is here.  If anybody is with

16   anybody else in the room who's not -- whose name

17   is not appearing on the Zoom log, can you please

18   identify who else is present?  Okay, so hearing

19   that nobody has identified any other participants,

20   we'll go with the log, plus the appearances by

21   phone that we've just heard.

22          MS. KNEELAND:  This is Jennifer --

Transcript of Proceeding
October 7, 2022                                    6

1   sorry, Brad.  This is Jennifer Kneeland speaking.

2   I see Joe Chazan and Eric Baker.  Would -- would

3   each of you kindly say who you represent?

4               MR. CHAZEN:  This is Joe Chazen and I

5   represent my law firm, Meyers Rodbell & Rosenbaum.

6               MR. BAKER:  Hello everyone.  This is

7   Eric Baker.  Dwight Mules will be joining also,

8   but working on behalf of Bulldog or Miguel

9   Lambert.  We're not participating in this auction.

10  We're simply monitoring it, considering that we

11  did put in a bid.

12              MS. KNEELAND:  Thank you.

13              MR. ENGLANDER:  Now, just because of the

14  hybrid nature of this proceeding, I want to

15  request that if anybody has any questions or

16  comments during the course of the presentation,

17  that in order to make sure we have a clean record,

18  either please make sure that nobody else is

19  speaking, or if somebody else is, please raise

20  your hand and wait till you're called on before

21  speaking.  And if you're not speaking, please mute

22  your line so that we can just have as clean a --

Transcript of Proceeding
October 7, 2022                                    7

1    an audio presentation as possible.  If -- if we do

2    get too much background noise or interruptions, we

3    may have to mute all lines and to open them one by

4    one as hands are raised.

5              I wanted to provide information to the

6    constituents in this case regarding current

7    status.  Some people may know this, but I -- I'll

8    go through the -- the high-level status on bidding

9    for the property.  The -- the debtor has received

10   two competing bids for the property that are

11   presently outstanding.  Both bids are irrevocable

12   subject to the terms of the bid procedures and the

13   order approving the bid procedures and according

14   to their own terms.  One is from A&A Hyde LLC,

15   which I understand is an affiliate of the Bulldog

16   Group.  The amount of the -- A&A's bid is

17   $6,500,000.  The purchase price is payable

18   $5,500,000 cash at closing, and a $1 million

19   promissory note with interest at 5 percent per

20   annum, monthly installments of principal and

21   interest with an amortization schedule over 10

22   years, with the maturity date on the third

Transcript of Proceeding
October 7, 2022                                          8

1   anniversary of the closing.  The A&A contract

2   provides for closing on or before November 30,

3   2022, extendable at purchaser's option for 15

4   days.  Obviously, the contract has many more terms

5   than that, but that's a very high-level

6   presentation or summary of -- of the A&A bid.

7            The second bid is from NVR Inc.  The

8   purchase price is all cash in the amount of

9   $7,500,000 and closing is to occur on the

10  satisfaction of various conditions.  One such

11  condition is that the debtor's airfield operations

12  have been terminated, all tenants have vacated the

13  premises and the above-ground fuel storage tanks

14  have been removed.  In addition to the two bids

15  that I just mentioned, NVR and the debtor had

16  entered into a stalking horse contract that the

17  Court preliminarily and conditionally approved.

18  NVR had the right under such contract to conduct

19  due diligence through September 29, 2022, and

20  either to proceed with the contract by delivering

21  a notice of intent to proceed by that date or the

22  contract would terminate of its own accord.  That

Transcript of Proceeding
October 7, 2022                                    9

1    deadline was extended by one week to October 6th.

2    NVR ultimately elected not to proceed under the

3    stocking horse contract and did not deliver a

4    notice of intent to proceed.  As a result, the

5    stocking horse contract has terminated.

6           For today, we understand from A&A Hyde

7    that it does not intend to increase its bid, and

8    based on that decision, A&A decided not to attend

9    the auction today, although I do note that, as Mr.

10   Baker indicated, he and perhaps one other from --

11   from the Bulldog organization are monitoring.

12   Given that there is no overbid being presented,

13   there's really very little for us to add.  I will

14   say this, we were asked approximately one and a

15   half hours ago for the directions to the office

16   here by another potential bidder with whom the

17   debtor had been in discussions.  That party has

18   not appeared as of this time, nor -- nor has it

19   submitted any sort of written bid.  And at this

20   time, the debtor simply reserves it rights with

21   respect to next steps.  At this point, if anybody

22   has any questions limited to the nature of the

Transcript of Proceeding
October 7, 2022                              10

1    discussion today, we are open to entertaining

2    those questions and, if appropriate, responding to

3    them.

4                DR. ASTERBADI:  I want to announce that

5    the debtor is canceling the auction.

6                MR. ENGLANDER:  Anybody have anything

7    further?

8                MR. HENRY:  I -- I have a sort of

9    procedural question, if I could please.  I'm --

10   I'm assuming that you're going to file some

11   document with the Court reporting what happened

12   today and providing a copy of the NVR $7.5 million

13   contract?

14               MR. ENGLANDER:  We will discuss that

15   internally.  We haven't ruled that out.

16               DR. ASTERBADI:  Okay.  Who's -- who --

17    who -- who's talking just now?

18               MR. HENRY:  Bruce Henry.

19               DR. ASTERBADI:  Oh, okay.  All right.

20               MR. HENRY:  All right.  Thank you Mr.

21   Englander.

22               MR. ENGLANDER:  And just for the

Transcript of Proceeding
October 7, 2022                                    11

1    reporter's convenience, the first person who spoke

2    up was Dr. Asterbadi, the debtor's principal.

3              MS. KNEELAND:  Good morning.  This is

4    Jennifer Kneeland.  In light of the information

5    that was just provided, what was the name of the

6    party who asked for directions to the Fraser

7    Forbes' office today?

8              MR. ENGLANDER:  Ameen Killidar.

9              MS. KNEELAND:  Could you spell that

10   please?

11             MR. ENGLANDER:  I believe it's

12   A-M-E-E-N, last name Killidar, K-I-L-L-I-D-A-R.

13             MR. KILLIDAR:  Yes.

14             MS. KNEELAND:  Okay.  And also, I

15   noticed that Mr. Selba, Counsel for Mr. Asterbadi,

16   is on the line.  What is the basis for Mr.

17   Asterbadi's statement a moment ago?

18             MR. ENGLANDER:  I -- I -- I'd like to

19   ask that -- you know, the parties are -- are free

20   to make their positions and we're not looking to

21   have this proceeding turn into a 2004 exam where

22   people are questioning one another about the basis

Transcript of Proceeding
October 7, 2022                                            12

1    for -- for actions or positions that they've

2    taken.  But we -- we certainly do want to make

3    sure to provide the basic information to all

4    parties so that everybody knows where -- where the

5    debtor stands.

6             MR. SELBA:  I agree with Mr. Englander,

7    Ms. Kneeland, to the extent you're waiting on me

8    to respond, but I leave it with the --

9             MS. KNEELAND:  (Crosstalk) not to answer

10   the question.  Very good.

11            MR. ENGLANDER:  I want to make sure that

12   we have -- I've noticed some additional parties

13   who have arrived since we began. E.  Meyers, I

14   think that's Evan Meyers.  Could you please

15   confirm?

16            MR. MEYERS:  That's correct.

17            MR. ENGLANDER:  And Dwight would be

18   Dwight Mules; is that correct?

19            MR. MULES:  Yes, that's correct.

20            MR. ENGLANDER:  All right.  And since we

21   began, has anybody joined, any one of the parties

22   who's listed on the Zoom?  All right, so I think

Transcript of Proceeding
October 7, 2022                                    13

1    we have our -- our record for today.  I thank

2    everybody for taking the time.  And I'm happy to

3    -- I -- I -- I wish I could say that we would had

4    -- have had more robust bidding, but at a minimum,

5    I'm happy to give you back the rest of your day.

6    And with that, I think we can conclude the

7    meeting.

8              MR. CHAZEN:  All right.  Thank you.

9              MR. ENGLANDER:  Thank you.

10             MR. HENRY:  Thanks.

11             MR. BAKER:  Thank you.

12             (Off the record at 10:12 a.m.)

13

14

15

16

17

18

19

20

21

22

Transcript of Proceeding
October 7, 2022                                    14

1                 CERTIFICATE OF COURT REPORTER

2

3              I, Julio Mendieta, the officer

4    before whom the foregoing proceedings were taken,

5    do hereby certify that said proceedings were

6    electronically recorded by me; and that I am

7    neither counsel for, related to, nor employed by

8    any of the parties to this case and have no

9    interest, financial or otherwise, in its outcome.

10

11

12    _____

13    Julio Mendieta, Court Reporter

14

15

16

17

18

19

20

21

22

1                 CERTIFICATION OF TRANSCRIPT

2

3        I, Karen M. Galvez, do hereby certify that the

4    foregoing transcript, to the best of my ability,

5    knowledge, and belief, is a true and correct

6    record of the proceedings; that said proceedings

7    were reduced to typewriting under my supervision;

8    and that I am neither counsel for, related to, nor

9    employed by any of the parties to this case and

10   have no interest, financial or otherwise, in its

11   outcome.

12

13   *Karen M Galvez*

14   _____

15   Karen M. Galvez

16   Planet Depos, LLC

17   October 10, 2022

18

19

20

21

22

Transcript of Proceeding
October 7, 2022

16

| **A** | | | |
|---|---|---|---|
| **a&a** | **amortization** | **assuming** | **behalf** |
| 7:14, 8:1, 8:6, | 7:21 | 10:10 | 6:8 |
| 9:6, 9:8 | **amount** | **asterbadi** | **being** |
| **a&a's** | 7:16, 8:8 | 3:14, 5:13, | 9:12 |
| 7:16 | **anniversary** | 10:4, 10:16, | **belief** |
| **a-m-e-e-n** | 8:1 | 10:19, 11:2, | 15:5 |
| 11:12 | **announce** | 11:15 | **believe** |
| **ability** | 10:4 | **asterbadi's** | 5:9, 5:14, |
| 15:4 | **annum** | 5:15, 11:17 | 11:11 |
| **about** | 7:20 | **attend** | **ben** |
| 11:22 | **another** | 9:8 | 4:17 |
| **above-ground** | 9:16, 11:22 | **attorney** | **benjamin** |
| 8:13 | **answer** | 5:15 | 3:4 |
| **accord** | 12:9 | **auction** | **best** |
| 8:22 | **any** | 2:1, 6:9, 9:9, | 15:4 |
| **according** | 4:11, 5:19, | 10:5 | **bid** |
| 7:13 | 6:15, 9:19, | **audio** | 4:7, 6:11, |
| **actions** | 9:22, 12:21, | 7:1 | 7:12, 7:13, |
| 12:1 | 14:8, 15:9 | **B** | 7:16, 8:6, 8:7, |
| **add** | **anybody** | **back** | 9:7, 9:19 |
| 9:13 | 5:15, 5:16, | 13:5 | **bidder** |
| **addition** | 6:15, 9:21, | **background** | 9:16 |
| 8:14 | 10:6, 12:21 | 7:2 | **bidding** |
| **additional** | **anything** | **baker** | 7:8, 13:4 |
| 12:12 | 10:6 | 3:17, 5:4, 6:2, | **bids** |
| **affiliate** | **appear** | 6:6, 6:7, 9:10, | 4:11, 7:10, |
| 7:15 | 4:22 | 13:11 | 7:11, 8:14 |
| **ago** | **appearances** | **bank** | **both** |
| 9:15, 11:17 | 4:21, 5:20 | 5:6 | 7:11 |
| **agree** | **appeared** | **based** | **bowman** |
| 12:6 | 4:20, 9:18 | 9:8 | 3:16 |
| **agreement** | **appearing** | **basic** | **brad** |
| 2:11 | 5:17 | 12:3 | 4:5, 6:1 |
| **airfield** | **application** | **basis** | **bradford** |
| 8:11 | 4:22 | 11:16, 11:22 | 3:3 |
| **all** | **appreciate** | **because** | **broker** |
| 4:4, 7:3, 8:8, | 5:2 | 6:13 | 4:16 |
| 8:12, 10:19, | **appropriate** | **become** | **bruce** |
| 10:20, 12:3, | 10:2 | 4:10 | 3:8, 10:18 |
| 12:20, 12:22, | **approved** | **been** | **bulldog** |
| 13:8 | 8:17 | 8:12, 8:14, | 6:8, 7:15, 9:11 |
| **also** | **approving** | 9:17 | **C** |
| 6:7, 11:14 | 7:13 | **before** | **called** |
| **although** | **approximately** | 2:11, 6:20, | 6:20 |
| 9:9 | 9:14 | 8:2, 14:4 | **canceling** |
| **ameen** | **arrived** | **began** | 10:5 |
| 11:8 | 12:13 | 12:13, 12:21 | **case** |
| | **asked** | | 7:6, 14:8, 15:9 |
| | 9:14, 11:6 | | |

Transcript of Proceeding
October 7, 2022                                                                17

**cash**
7:18, 8:8
**certainly**
12:2
**certificate**
14:1
**certification**
15:1
**certify**
14:5, 15:3
**chazan**
6:2
**chazen**
3:7, 6:4, 13:8
**chris**
3:6
**clean**
6:17, 6:22
**clear**
4:10
**closing**
7:18, 8:1, 8:2, 8:9
**comments**
6:16
**competing**
7:10
**conclude**
13:6
**condition**
8:11
**conditionally**
8:17
**conditions**
8:10
**conduct**
8:18
**conducting**
4:6
**conference**
5:10, 5:11
**confirm**
12:15
**considering**
6:10
**constituents**
7:6
**contract**
8:1, 8:4, 8:16,

8:18, 8:20, 8:22, 9:3, 9:5, 10:13
**convenience**
11:1
**copy**
10:12
**correct**
12:16, 12:18, 12:19, 15:5
**could**
10:9, 11:9, 12:14, 13:3
**counsel**
11:15, 14:7, 15:8
**course**
6:16
**court**
4:2, 4:17, 8:17, 10:11, 14:1, 14:13
**court's**
4:7
**crosstalk**
12:9
**current**
7:6

**D**
**date**
7:22, 8:21
**david**
3:12, 3:16
**day**
13:5
**days**
8:4
**deadline**
9:1
**debtor**
7:9, 8:15, 9:17, 9:20, 10:5, 12:5
**debtor's**
4:9, 4:15, 8:11, 11:2
**decided**
9:8

**decision**
9:8
**deliver**
9:3
**delivering**
8:20
**depos**
15:16
**dialed**
5:10
**diligence**
8:19
**directions**
9:15, 11:6
**discuss**
10:14
**discussion**
10:1
**discussions**
9:17
**document**
10:11
**donahue**
3:9
**dr**
5:13, 5:14, 10:4, 10:16, 10:19, 11:2
**due**
8:19
**duly**
4:2
**during**
6:16
**duties**
4:9
**dwight**
3:19, 6:7, 12:17, 12:18

**E**
**each**
5:2, 6:3
**either**
6:18, 8:20
**elected**
9:2
**electronically**
14:6

**else**
5:13, 5:16, 5:18, 6:18, 6:19
**employed**
14:7, 15:9
**englander**
3:3, 4:4, 4:5, 5:7, 5:12, 6:13, 10:6, 10:14, 10:21, 10:22, 11:8, 11:11, 11:18, 12:6, 12:11, 12:17, 12:20, 13:9
**entered**
8:16
**entertaining**
10:1
**eric**
3:17, 6:2, 6:7
**esquire**
3:3
**estate**
2:4, 4:15
**evan**
3:18, 12:14
**everybody**
4:5, 5:13, 12:4, 13:2
**everyone**
6:6
**exam**
11:21
**exercise**
4:9
**expect**
4:10
**extendable**
8:3
**extended**
9:1
**extent**
12:7

**F**
**fiduciary**
4:9
**file**
10:10

Transcript of Proceeding
October 7, 2022

| | | | |
|---|---|---|---|
| **financial** | **hand** | **information** | **karen** |
| 14:9, 15:10 | 6:20 | 7:5, 11:4, 12:3 | 15:3, 15:15 |
| **firm** | **hands** | **informational** | **killidar** |
| 6:5 | 7:4 | 4:12 | 11:8, 11:12, |
| **first** | **happened** | **installments** | 11:13 |
| 11:1 | 10:11 | 7:20 | **kindly** |
| **forbes** | **happy** | **intend** | 6:3 |
| 2:4, 4:15, | 13:2, 13:5 | 9:7 | **kneeland** |
| 4:16, 4:17, 11:7 | **heard** | **intent** | 3:10, 5:22, |
| **foregoing** | 5:21 | 8:21, 9:4 | 6:1, 6:12, 11:3, |
| 14:4, 15:4 | **hearing** | **interest** | 11:4, 11:9, |
| **format** | 5:18 | 7:19, 7:21, | 11:14, 12:7, |
| 4:14 | **held** | 14:9, 15:10 | 12:9 |
| **fraser** | 2:1 | **internally** | **know** |
| 2:4, 4:15, | **hello** | 10:15 | 7:7, 11:19 |
| 4:16, 4:17, 11:6 | 6:6 | **interruptions** | **knowledge** |
| **free** | **henry** | 7:2 | 15:5 |
| 11:19 | 3:8, 10:8, | **irrevocable** | **knows** |
| **friday** | 10:18, 10:20, | 7:11 | 12:4 |
| 1:10 | 13:10 | | |
| **fuel** | **here** | **J** | **L** |
| 8:13 | 5:14, 5:15, | **jennifer** | **lambert** |
| **further** | 9:16 | 3:10, 5:22, | 6:9 |
| 10:7 | **hereby** | 6:1, 11:4 | **large** |
| | 14:5, 15:3 | **jessica** | 4:12 |
| **G** | **hi** | 3:15 | **last** |
| **gaffey** | 5:5 | **job** | 11:12 |
| 3:12 | **high-level** | 1:20 | **law** |
| **galvez** | 7:8, 8:5 | **joe** | 6:5 |
| 15:3, 15:15 | **horse** | 3:7, 5:14, 6:2, | **leave** |
| **give** | 8:16, 9:3, 9:5 | 6:4 | 12:8 |
| 13:5 | **hours** | **johannes** | **light** |
| **given** | 9:15 | 3:4, 4:17 | 11:4 |
| 9:12 | **hybrid** | **joined** | **limited** |
| **go** | 4:13, 6:14 | 12:21 | 9:22 |
| 5:20, 7:8 | **hyde** | **joining** | **line** |
| **going** | 7:14, 9:6 | 6:7 | 5:10, 5:11, |
| 10:10 | | **jones** | 6:22, 11:16 |
| **good** | **I** | 3:6 | **lines** |
| 4:4, 5:12, | **identified** | **joseph** | 7:3 |
| 11:3, 12:10 | 5:19 | 3:11 | **listed** |
| **groft** | **identify** | **julio** | 12:22 |
| 3:13, 5:5 | 5:2, 5:18 | 1:22, 2:11, | **little** |
| **group** | **inc** | 14:3, 14:13 | 9:13 |
| 7:16 | 8:7 | | **llc** |
| | **increase** | **K** | 7:14, 15:16 |
| **H** | 9:7 | **k-i-l-l-i-d-a-r** | **located** |
| **half** | **indicated** | 11:12 | 4:14 |
| 9:15 | 9:10 | | |

Transcript of Proceeding
October 7, 2022

19

| | | | |
|---|---|---|---|
| location | monitoring | noticed | out |
| 2:1 | 6:10, 9:11 | 11:15, 12:12 | 10:15 |
| log | monthly | november | outcome |
| 5:17, 5:20 | 7:20 | 8:2 | 14:9, 15:11 |
| looking | montrose | nvr | outstanding |
| 11:20 | 2:5 | 8:7, 8:15, | 7:11 |
| **M** | more | 8:18, 9:2, 10:12 | over |
| make | 8:4, 13:4 | nvr's | 7:21 |
| 6:17, 6:18, | morning | 5:11 | overbid |
| 11:20, 12:2, | 4:4, 4:6, 11:3 | **O** | 9:12 |
| 12:11 | much | obviously | own |
| many | 7:2 | 8:4 | 7:14, 8:22 |
| 8:4 | mules | occur | **P** |
| maryland | 3:19, 6:7, | 8:9 | pages |
| 1:9, 2:6, 2:12 | 12:18, 12:19 | october | 1:21 |
| matters | mute | 1:10, 9:1, | parsels |
| 4:8 | 6:21, 7:3 | 15:17 | 3:5, 4:16 |
| maturity | **N** | office | participants |
| 7:22 | nabil | 9:15, 11:7 | 5:19 |
| mcmahon | 3:14 | officer | participating |
| 3:15 | name | 14:3 | 6:9 |
| means | 5:16, 11:5, | offices | parties |
| 4:11 | 11:12 | 4:15 | 11:19, 12:4, |
| meeting | named | oh | 12:12, 12:21, |
| 13:7 | 4:21 | 10:19 | 14:8, 15:9 |
| mendieta | names | okay | party |
| 1:22, 2:11, | 5:1 | 5:7, 5:12, | 9:17, 11:6 |
| 14:3, 14:13 | nature | 5:18, 10:16, | patrick |
| mentioned | 6:14, 9:22 | 10:19, 11:14 | 3:9 |
| 8:15 | need | one | payable |
| meyers | 4:20 | 5:2, 7:3, 7:4, | 7:17 |
| 3:18, 6:5, | neither | 7:14, 8:10, 9:1, | people |
| 12:13, 12:14, | 14:7, 15:8 | 9:10, 9:14, | 4:19, 4:21, |
| 12:16 | next | 11:22, 12:21 | 7:7, 11:22 |
| michael | 9:21 | open | percent |
| 3:5 | nobody | 7:3, 10:1 | 7:19 |
| miguel | 5:19, 6:18 | operations | perhaps |
| 6:8 | noise | 8:11 | 9:10 |
| mike | 7:2 | option | person |
| 3:13, 4:16, | notary | 8:3 | 11:1 |
| 5:5, 5:7 | 2:12 | order | phone |
| million | note | 4:7, 6:17, 7:13 | 5:1, 5:21 |
| 7:18, 10:12 | 7:19, 9:9 | organization | place |
| minimum | notes | 9:11 | 4:13 |
| 13:4 | 4:19 | other | planet |
| moment | notice | 5:19, 9:10 | 15:16 |
| 11:17 | 8:21, 9:4 | otherwise | please |
| | | 14:9, 15:10 | 5:17, 6:18, |

6:19, 6:21,
10:9, 11:10,
12:14
**plus**
5:20
**point**
9:21
**positions**
11:20, 12:1
**possible**
7:1
**potential**
9:16
**potomac**
1:9, 2:6
**preliminarily**
8:17
**premises**
8:13
**present**
5:18
**presentation**
6:16, 7:1, 8:6
**presented**
4:11, 9:12
**presently**
7:11
**price**
7:17, 8:8
**principal**
7:20, 11:2
**procedural**
10:9
**procedures**
4:7, 4:8, 7:12,
7:13
**proceed**
8:20, 8:21,
9:2, 9:4
**proceeding**
4:6, 4:12,
4:13, 6:14,
11:21
**proceedings**
4:18, 14:4,
14:5, 15:6
**proceeeding**
1:7

**promissory**
7:19
**property**
7:9, 7:10
**provide**
7:5, 12:3
**provided**
11:5
**provides**
8:2
**providing**
10:12
**public**
2:12
**purchase**
7:17, 8:8
**purchaser's**
8:3
**pursuant**
2:11, 4:6
**put**
6:11

**Q**

**question**
10:9, 12:10
**questioning**
11:22
**questions**
6:15, 9:22,
10:2

**R**

**raise**
6:19
**raised**
7:4
**real**
2:4, 4:15
**really**
9:13
**reasons**
4:10
**received**
7:9
**record**
6:17, 13:1,
13:12, 15:6

**recorded**
1:22, 14:6
**reduced**
15:7
**regarding**
7:6
**related**
4:8, 14:7, 15:8
**removed**
8:14
**reporter**
4:2, 4:18,
14:1, 14:13
**reporter's**
11:1
**reporting**
10:11
**represent**
6:3, 6:5
**request**
6:15
**reserves**
9:20
**respect**
4:19, 9:21
**respond**
12:8
**responding**
10:2
**rest**
13:5
**result**
9:4
**right**
4:4, 8:18,
10:19, 10:20,
12:20, 12:22,
13:8
**rights**
9:20
**road**
2:5
**robust**
13:4
**rodbell**
6:5
**room**
5:16

**rosenbaum**
6:5
**ruled**
10:15

**S**

**said**
14:5, 15:6
**sandy**
5:6
**satisfaction**
8:10
**say**
6:3, 9:14, 13:3
**schedule**
7:21
**second**
8:7
**see**
5:13, 6:2
**selba**
3:11, 5:14,
11:15, 12:6
**september**
8:19
**services**
2:4
**signature-5tm1q**
15:13
**signature-bi6ds**
14:11
**simply**
6:10, 9:20
**since**
12:13, 12:20
**some**
7:7, 10:10,
12:12
**somebody**
6:19
**sorry**
6:1
**sort**
9:19, 10:8
**speaker**
5:9
**speaking**
6:1, 6:19, 6:21

Transcript of Proceeding
October 7, 2022                                                    21

spell
11:9
spoke
11:1
spring
5:6
stalking
8:16
stands
12:5
state
2:12
statement
11:17
status
7:7, 7:8
steps
9:21
stocking
9:3, 9:5
storage
8:13
subject
7:12
submitted
9:19
suite
2:5
summary
8:6
supervision
15:7
sure
6:17, 6:18,
12:3, 12:11
sworn
4:3

**T**

take
4:13
taken
12:2, 14:4
taking
4:19, 13:2
talking
10:17
tanks
8:13

tenants
8:12
terminate
8:22
terminated
8:12, 9:5
terms
7:12, 7:14, 8:4
thank
5:7, 6:12,
10:20, 13:1,
13:8, 13:9,
13:11
thanks
13:10
themselves
5:3
think
4:20, 12:14,
12:22, 13:6
third
7:22
through
7:8, 8:19
till
6:20
time
9:18, 9:20,
13:2
today
4:11, 9:6, 9:9,
10:1, 10:12,
11:7, 13:1
transcribing
4:18
transcript
15:1, 15:4
true
15:5
turn
11:21
two
4:22, 7:10,
8:14
typewriting
15:7

**U**

ultimately
9:2

under
8:18, 9:2, 15:7
understand
7:15, 9:6
unidentified
5:9

**V**

vacated
8:12
various
8:10

**W**

wait
6:20
waiting
12:7
want
6:14, 10:4,
12:2, 12:11
wanted
7:5
we'll
5:20
we're
6:9, 6:10,
11:20
we've
5:21
week
9:1
whereupon
4:2
wish
13:3
working
6:8
written
9:19

**Y**

yeah
5:4
years
7:22

**Z**

zachair
1:8

zoom
4:20, 4:22,
5:17, 12:22

**$**

$1
7:18
$5,500,000
7:18
$6,500,000
7:17
$7,500,000
8:9
$7.5
10:12

**0**

00
1:11

**1**

10
1:11, 7:21,
13:12, 15:17
12
13:12
15
1:21, 8:3
1757
5:3

**2**

2004
11:21
2022
1:10, 8:3,
8:19, 15:17
20854
2:6
29
8:19

**3**

30
8:2
3280
5:8

**4**

466548
1:20

Transcript of Proceeding
October 7, 2022                                          22

| 5 |
|---|
| **500** |
| 2:5 |
| **6** |
| **6th** |
| 9:1 |
| **7** |
| **7811** |
| 2:5 |

# EXHIBIT E

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MARYLAND**
**GREENBELT DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | Case No. 20-10691-TJC |
| | ) | Chapter 11 |
| | ) | |
| ZACHAIR, LTD., | ) | 6500 Cherrywood Lane |
| | ) | Greenbelt, Maryland 20770 |
| | ) | |
| | ) | |
| Debtor. | ) | October 19, 2022 |

TRANSCRIPT OF THE COURT'S RULING RE AMENDED CHAPTER 11
PLAN FILED BY DEBTOR ZACHAIR, LTD. (DOC 365); MOTION
FOR MISCELLANEOUS RELIEF FILED BY INTERESTED PARTY
NVR, INC. (DOC 383); BRIEF FILED BY CREDITOR
SANDY SPRING BANK (388)
BEFORE THE HONORABLE THOMAS J. CATLIOTA
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:             Whiteford Taylor & Preston, L.L.P.
                            By:  BRADFORD F. ENGLANDER, ESQ.
                            3190 Fairview Park, Suite 800
                            Falls Church, VA 22042

For Nabil Asterbadi:        Tydings & Rosenberg LLP
                            By:  JOSEPH MICHAEL SELBA, ESQ.
                            1 East Pratt Street
                            Suite 901
                            Baltimore, MD 21202

For NVR, Inc.:              Watt, Tieder, Hoffar & Fitzgerald, LLP
                            By:  JENNIFER LARKIN KNEELAND, ESQ.
                            1765 Greensboro Station Place
                            Suite 1000
                            McLean, VA 22102

Operator:                   Rita Hester, Courtroom Deputy
                            to the Honorable Thomas J. Catliota

TRANSCRIPTION SERVICE:      TRANSCRIPTS PLUS, INC.
                            435 Riverview Circle
                            New Hope, Pennsylvania 18938
                            Telephone:  215-862-1115
                            e-mail CourtTranscripts@aol.com

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

2

```
APPEARANCES:
(Continued)

For Sandy Spring Bank:    Henry & O'Donnell, P.C.
                          By:  BRUCE W. HENRY, ESQ.
                               KEVIN M. O'DONNELL, ESQ.
                          300 N. Washington Street
                          Suite 204
                          Alexandria, VA 22314

For The Bulldog Group     DLA Piper LLP (US)
LLC and AAI LLC:          By:  C. KEVIN KOBBE, ESQ.
                          The Marbury Building
                          6225 Smith Avenue
                          Baltimore, Maryland 21209-3600

For the U.S. Trustee:     Office of the U.S. Trustee
                          By:  L. JEANETTE RICE, ESQ.
                          6305 Ivy Lane
                          Suite 600
                          Greenbelt, MD 20770

For Prince George's       Meyers, Rodbell & Rosenbaum, P.A.
County, MD:               By:  M. EVAN MEYERS, ESQ.
                          Berkshire Building
                          6801 Kenilworth Avenue
                          Suite 400
                          Riverdale Park, MD 20737
```

(AS REQUESTED BY THE ORDERING PARTY, ONLY THE COURT'S RULING IN
      THE MATTERS LISTED ON THE COVER ARE TO BE TRANSCRIBED)

        THE COURT:  All right.  Thank you, all, very much for a long day and the well-presented arguments by the parties.

        Two matters are before me:  One is the confirmation of the Debtor's plan.  The hearing on confirmation was set for today;

        The second thing is the motion by NVR to enforce the Court's order conditionally approving the sale of the Debtor's property free and clear, and declaring NVR as the prevailing bidder.

        For the reasons in this bench ruling, I'm going to grant NVR's motion, and I am going to continue the plan consistent with my ruling -- continue the hearing on the plan consistent with my ruling.

        This case was filed as a Chapter 11 petition on January 17th, 2020 and, therefore, it has gone for two years and nine months.  The Debtor is a Maryland corporation which owns real property, totaling approximately 423.45 acres located in Prince George's County, Maryland.

        I will point out that almost all of my findings today, this evening, are based on the evidence that was presented today, but also on incontrovertible facts that have been of record in this case since the beginning of the case. The Debtor operates a portion of the property as an airfield,

4

1  known as Hyde Field, which generates revenues for the Debtor

2  through the rental of hangar and parking spaces for aircraft.

3  See, for example, ECF 215 at Page 6.

4           In addition to the airfield, pursuant to a mining

5  permit issued by the Maryland Department of Environment,

6  portions of the property previously were mined for sand and

7  gravel.  The cavities created by the sand and gravel mining

8  were used to surcharge fill operations.  The Debtor contracted

9  for the acceptance of fill dirt removed from other third-party

10 sites in exchanges for a fee.  For several years, such fees

11 generated a majority of the Debtor's operating revenues, but

12 MDE advised the Debtor that it must cease the surcharge fill

13 operations.  ECF 215 at Paragraphs 7 and 8.

14          From the very beginning of this case, it has been

15 apparent that the Debtor has sought to sell the property.  As

16 the Debtor itself noted in the filing I just referred to,

17 quote, "As noted in nearly every pleading filed in this Court

18 since the petition date, the Debtor commenced this Chapter 11

19 case to facilitate the sale of the property.  Since the

20 commencement of the case, the Debtor has focused its limited

21 resources on selling its primary assets, the property, to

22 satisfy its obligations to creditors and parties in interest.

23 The Debtor has retained a number of experienced professionals

24 in the connection with the marketing and sale of property since

25 the petition date to assist it with those sales efforts,"

1  unquote.   See ECF 215 at Paragraph 20.

2          The Debtor went on to say that at point, which was
3  June 11th, 2021, using its proprietary database of hundreds of
4  local, regional, national, and international prospective
5  buyers, the broker identified and contacted numerous financial
6  and strategic investors to garner interest in pursuing the
7  potential sale of the property.

8          Commencing on July 7th, 2020, the broker contacted
9  and sent teasers to 75 interested parties.  Twenty-four of the
10 interested parties executed confidentiality agreements and were
11 asked to submit initial non-binding letters of intent or
12 expressions of interest.  The interested parties that had
13 executed confidentiality agreements were then given the
14 opportunity to access an electronic data room.  Id at
15 Paragraph 21.

16         Following the receipt of indications of interest from
17 several potential buyers, the broker began to engage in
18 advanced discussions regarding a potential sale transaction for
19 the property with such parties.  After reviewing and carefully
20 considering the letter of intent or expressions of interest,
21 the Debtor determined, in consultation with its advisors, that
22 the best and highest offer was from what is referred to in the
23 motion I'm quoting from, the stalking horse purchaser.  Id at
24 Paragraph 22.

25         The stalking horse purchaser was J.P. Land Holding,

1   LLC.  And on July 27th, 2021, at ECF 235, I entered an order

2   approving the sale of the Debtor's properties to J.P. Land

3   Holding, LLC.  That sale -- that contract was subject to higher

4   and better offers, and subject to Court-approved bid procedures

5   that established the bid deadline, an auction, notice to

6   prevailing bidder, and the other requirements that are typical

7   of a bankruptcy sale process.

8           The Debtor also filed a disclosure statement on

9   October 15th, 2021, seeking to confirm a plan which would

10  effectuate the sale of the -- to the stalking horse purchaser.

11          On June 5th, 2021, the Debtor filed a second motion

12  for an order approving the sale of the property free and clear.

13  This order -- this motion sought approval of a stalking horse

14  contract to NVR Inc.  The Debtor explained, as was well known

15  to all parties at that time, the J.P. Land Holdings terminated

16  the contract at the end of its study period.  Following the

17  termination of that contract, the Debtor continued to market

18  the property and negotiate with other potential purchasers.

19  ECF 321 at Paragraph 1.

20          The Debtor engaged in extensive marketing and

21  negotiations following the termination of the J.P. Land Holding

22  contract.  Id.

23          The Debtor determined that, quote, "Ultimately, a

24  competitive bidding process and the market check that any

25  potential auction will provide will, in the Debtor's reasonable

1  business judgment, result in the highest or otherwise best
2  offer for the property, and will provide a greater recovery for
3  the Debtor's estate than any known available alternative,"
4  unquote.  That's Paragraph 2 of ECF 321.
5        Indeed, the process that led to the NVR stalking
6  horse contract, as I will refer to it, was extensive.  As
7  reflected in the Debtor's disclosure statement, Page 108
8  of ECF 366, the administrative claims in this case approach, if
9  not exceed, $3 million.  The Debtor has hired very competent
10 counsel, land use experts, and others in an effort to generate
11 a buyer for this property, as I will discuss further.
12       The Debtor -- in the motion I referred to at ECF 321,
13 the Debtor, again, characterized its efforts following the
14 termination of the J.P. Land Holdings contract.  Referred to it
15 as, quote, "extensive marketing of the property," unquote,
16 quote, "robust marketing process," unquote, "extensive
17 discussions with its advisors," unquote.  ECF 321 at
18 Paragraph 9.
19       As part of those sales and marketing processes that I
20 described, in addition to the -- that generated the
21 administrative claims that I have just referred to, the motion
22 stated that the Debtor procured various reports and analyses,
23 including geotechnical reports, engineering analysis,
24 environmental studies, and preliminary design work.  The
25 Debtor also engaged land use counsel and consultant to

1  assist discussions with representatives of the Prince George's
2  County.

3          Following the termination of the J.P. Land Holdings
4  contract, the Debtor and its advisors met with County and State
5  representatives to gain a better understanding of the
6  likelihood of obtaining development approvals with respect to
7  the property.  The information that the Debtor obtained through
8  the foregoing efforts informed the Debtor regarding the
9  development expectations and aided the Debtor in negotiating
10 the contract with NVR.  ECF 21, Paragraph 28.

11         I point out all of these statements by the Debtor
12 to establish what I believe is largely not disputed.  This
13 Debtor has engaged in extensive marketing efforts with a very
14 competent team of professionals.  And those extensive marketing
15 efforts are what has brought us here today.  But those
16 extensive marketing efforts have been costly, they have taken
17 time, and they have cut into whatever recovery is available for
18 the creditors.  Perhaps of necessity, I'm not suggesting that
19 the efforts weren't well-formed, but I am saying that this
20 property has been about as extensively marketed, vetted, and
21 addressed by professionals as a property can be.

22         Now, overlaying this process has been some concerns
23 about Dr. Asterbadi, which people have addressed, but never
24 brought to a head, if you will.  So, for example, in the
25 opposition of the bank, the Debtor's second motion to approve

1  the NVR sale, the bank pointed out Dr. Asterbadi is essentially
2  responsible for a large part of why this property is so
3  difficult to sell at this point.  As the bank pointed out at
4  ECF 339 at Paragraph 6, quote, "It is of note that substantial
5  income generated from the fill operations has been admitted by
6  Dr. Asterbadi to have completely withdrawn from the Debtor by
7  the shareholders.  Upon information and belief, the surcharge
8  operations were providing between a half and three-quarters of
9  a million dollars per year in cash income paid by entities for
10 the ability to discharge their fill on the property.  Dr.
11 Asterbadi has admitted that essentially all of this money was
12 withdrawn by or used for the benefit of the shareholders since
13 his retirement from the medical practice about a decade.  The
14 Debtor's bankruptcy scheduled disclose withdrawals by Dr.
15 Asterbadi and his wife of over one and a half million dollars
16 in the two years preceding the filing of this Chapter 11 case,"
17 unquote.

18        And that statement by the bank is consistent with the
19 testimony of Dr. Asterbadi today, although whether it's several
20 hundred thousand dollars, or a half a million dollars, or
21 three-quarters of a million dollars a year, there is no doubt
22 that Dr. Asterbadi withdrew millions of dollars from this
23 project as a result of the landfill operations, which I will
24 describe, has led to a lot of the problems with selling the
25 property today.

1          Other concerns about Dr. Asterbadi's role in the case
2    is set forth in the disclosure statement filed by the Debtor
3    ECF 366 at Page 15.  There, under Paragraph Section 205D, it
4    states that Dr. Asterbadi and Mrs. Asterbadi, quote, "Owed the
5    Debtor $831,809 in shareholder loans as December 31, 2019.  The
6    Debtor has not yet filed its 2020 Federal tax return which may
7    reflect changes in the shareholder loans owed to the Debtor,"
8    unquote.

9          When the parties have talked about the assets of the
10   Debtor, and what funds are available to the Debtor, other than
11   this reference to the shareholder loans owed by Dr. Asterbadi
12   to the Debtor, I have not seen any other real reference to that
13   to determine whether those funds are available, not available,
14   valid or not valid.

15         Against this backdrop, Dr. Asterbadi has come forward
16   today with a proposed term sheet.  Dr. Asterbadi is a 50
17   percent shareholder and the President of the Debtor.  His
18   proposed term sheet requires a discussion of some salient
19   points.  I am told that Dr. Asterbadi will not go forward with
20   a plan or the sale to NVR unless he has an opportunity to
21   present his proposal to the creditors.

22         There are a number of salient points in the term
23   sheet, but I will address Paragraphs 9C, D, and E.  In
24   Paragraph C, if the distribution to the general unsecured
25   creditors is at least 25 percent of allowed claims, Dr.

1   Asterbadi will be allowed to keep the two Mercedes-Benz
2   that the Debtor owns, that apparently he has been driving.
3   Those Mercedes-Benz were valued at $35,000 and $112,000 in
4   Debtor's schedules filed on January 29th, 2020 at ECF 11 at
5   Page 10.

6          Thus, for increasing the distribution to unsecured
7   creditors, Dr. Asterbadi gets to keep two cars, which at least
8   two and a half years ago, or three years ago had a value of
9   $150,000.

10          Dr. Asterbadi also, in Paragraph E, all claims and
11   causes of action of the estate against the owners will be
12   released under the term sheet if the plan is confirmed.  As I
13   said, the disclosure statement reflects that Dr. Asterbadi and
14   Mrs. Asterbadi owe $831,000 to the Debtor.  Presumably that
15   claim would be released, and that's -- I don't know whether
16   that has value or to doesn't have value, but it seems to me to
17   be way out of proportion, potentially, to the value that is
18   generated to the unsecured creditors by this term sheet.

19          And Paragraph 9D, it strikes that the plan will
20   provide that future distributions based on promissory notes,
21   profit sharing arrangements, or other similar arrangements are
22   to be reserved for the benefit of the equity owners.  But
23   considering, for example, that the backup bid has a million
24   dollar promissory note, I find this provision to be very
25   problematic and potentially mischievous.

1         I will now turn to the NVR bid contract.  As I said,

2    NVR had a stalking horse contract, but that contract terminated

3    on its own accord after 90 days if NVR did not issue a notice

4    to proceed.  It had submitted a bid at the auction of $7.5

5    million.

6         On behalf of NVR, Patrick Donahue testified.  He is

7    the Vice President for Regional Land Acquisition, and has been

8    involved in about 50 land deals for NVR at a cost of

9    $1.4 billion or so.  I found Mr. Donahue to be knowledgeable,

10   credible, and thorough, and I accept his testimony.

11        In addition, much of his testimony was corroborated

12   by Mr. Sammet (phonetic), who has been the broker on this

13   property for almost 10 years.

14        Since the NVR stalking horse contract was accepted,

15   NVR has put in about 2,000 hours of time on the project.  Mr.

16   Donahue compiled a team that was challenged the Washington

17   Commanders on any given Sunday.  He has retained bankruptcy

18   counsel, Maryland counsel, and environmental consultants,

19   lobbyists, land engineers, traffic engineers, and others.  The

20   cost of all this is at least $300,000, and you wouldn't be

21   surprised if it were $400,000.

22        The project has many challenges.  He's testified

23   about them at length, and I accept that testimony.  Perhaps the

24   biggest challenge is the difficulty in obtaining approvals to

25   develop the property as a direct result of Dr. Asterbadi's

1  prepetition actions over 10 years to allow excess uncontrolled
2  fill to be deposited on the property.  It is ironic, to say the
3  least, and perhaps bad faith that Dr. Asterbadi is directly
4  responsible for the current difficulties in selling the project
5  and developing the project.  In one sense, at least, Dr.
6  Asterbadi has already received the value of this property, as
7  if it were not challenged by the fill dirt problem, by
8  withdrawing from the Debtor the revenues derived from that
9  process.

10         The uncontrolled fill, however, was not the only
11  problem that the project faces.  Mr. Donahue testified about a
12  number of them.  There is no zoning in place; there is no plan
13  of development in place; and the project needs new zoning.  The
14  market conditions have worsened since the NVR stalking horse
15  contract was accepted, and they are now the worst that Mr.
16  Donahue has seen since before the great recession in 2007.  He
17  gave the example of lots that decreased in value from $400,000
18  to $315,000 as an example.  The rising interest rates are
19  causing a decrease in demand of these properties, of
20  residential properties, and this is presenting a challenge to
21  any development.

22         The road issue facing this development are
23  substantial.  Mr. Donahue testified about the millions of
24  dollars of problems that the road issues presents.

25         I conclude it is just as likely as not that the next

14

1   offer, other than NVR's, may be lower rather than higher than

2   NVR's bid contract.  Given NVR's knowledge of the property

3   gained from 2,000 hours of effort and 300 to 400,000 cost of

4   professionals, I see no reasonable likelihood that someone will

5   come forward and submit a better offer within 60 days.

6        Indeed, the backup bid at the auction was

7   considerably less than the NVR bid.  I conclude that the NVR

8   contract is the highest and best offer available under the

9   circumstances and should be accepted.

10       I further conclude the Debtor has offered no credible

11  reason for not accepting the NVR bid contract other than that

12  Dr. Asterbadi wants a chance to improve his personal financial

13  conditions.

14       I also conclude that NVR is a good faith purchaser

15  under Section 363(m) of the Bankruptcy Code.  I find nothing

16  improper or wrong about NVR allowing the stalking horse

17  contract to lapse under the circumstances of the property, the

18  changing market conditions, and the challenges to develop.

19       I will respond to several of Dr. Asterbadi's

20  arguments.  I disagree that the Debtor was placed in a

21  difficult position or untenable position at the auction, that

22  it could not reasonably have anticipated by the timing of the

23  lapse of the NVR stalking horse contract.  Everyone knew that

24  contract had an express 90-day test period.  Everyone know the

25  date that that test period would lapse.

1        There was always a very real possibility, if not

2   probability, that NVR would not proceed with a stalking horse

3   contract.   Indeed, in the bank's objection to the NVR -- to the

4   motion to approve the NVR contract, the bank described the NVR

5   contract as nothing other than an option to allow NVR to take a

6   harder look at that property.  Dr. Asterbadi could have engaged

7   in discussions with others about entering an agreement during

8   that period with disclosure, of course.

9        In addition, there is no sale in prospect, no letter

10  of intent, no potential identified buyer, there's nothing

11  concrete, there's not even anything soft to offer that a

12  competitive sale could be accepted within 60 days.  This would

13  be the classic proverbial bird in the hand versus two in the

14  bush, except in this case, it might well be a bird in the hand

15  versus one half of a bird in the bush.

16       As the broker testified, anything is possible, but

17  this Court does not make decisions based on anything being

18  possible.

19       I will also address the concern that NVR is locked

20  into its bid and cannot terminate its bid contract -- bid

21  proposal until either the Debtor allows -- rejects the bid or

22  the Court rejected.

23       In essence, Dr. Asterbadi is asking the Court to take

24  a chance that the Debtor's view of the position of NVR's bid

25  contract is correct, and that NVR has no ability to terminate

1  the bid contract.  This is not something the Court is prepared

2  to do under the circumstances of this case.  I see very little

3  upside to the 60-day -- giving Dr. Asterbadi's 60 days.  In

4  fact, I see most of the upside to giving Dr. Asterbadi's 60

5  days befalls Dr. Asterbadi, rather than the creditors.  I think

6  the risk -- the risk of continued litigation or NVR walking

7  away from its bid contract does not warrant the benefit that

8  Dr. Asterbadi has proposed.

9        The question is, where does this leave us considering

10 the statement that Dr. Asterbadi will not go forward as the

11 person in charge of the Debtor unless he is allowed to go

12 forward with his proposal.  I will give any party until close

13 of business Tuesday, October 25 to file whatever motion they

14 deem appropriate, whether to enforced the settlement agreement,

15 appoint a Chapter 11 Trustee, convert to Chapter 7, appoint a

16 plan administrator, whatever they deem is appropriate.

17       I will give the Debtor and Dr. Asterbadi by close of

18 business Monday, October 31st to file a response.

19       I will hold it hearing on any filed motion on

20 November 2nd at 10:30.

21       Given the amount of administrative expenses that have

22 been paid in this case, given the extensive marketing efforts

23 that have resulted in -- after $3 million of administrative

24 expenses that resulted in the highest and best contract being

25 7.5 million, given the difficulties with any sale of this

property, I conclude that this process needs to be resolved

quickly, efficiently, and with the least amount of cost

available.  I realized the time I've set is short, but under

the circumstances, it is entirely appropriate.

Therefore, I will approve the NVR bid contract as the

highest and best offer, and we will await additional filings by

the parties as I've described.

Ms. Kneeland, I'm going to ask you to submit a first

order.

MS. KNEELAND:  I will.

THE COURT:  And we'll see where we end up with the

filings.

Is there any questions, Mr. Englander?

MR. ENGLANDER:  Yes, Your Honor.  You mentioned that

you would be adjourning the confirmation hearing.

THE COURT:  Yes.

MR. ENGLANDERS:  Should that be adjourned to the same

date and time?

THE COURT:  I'm going to continue it to the same date

and time, and we'll see where we are at that time.

MR. ENGLANDER:  Okay, very good.

THE COURT:  Okay.

MR. ENGLANDER:  Thank you.

THE COURT:  I -- we'll see where we are, but I want

the parties to give some thought to how we can get this sale

18

1  closed by the end of the year.

2          All right, thank you.

3          MR. ENGLANDER:  Thank you, Your Honor.

4          THE CLERK:  All rise.  This Court is adjourned.

5  (Whereupon, the requested portion to be transcribed concluded,

6              the hearing was adjourned.)

7

8

9              CERTIFICATE OF TRANSCRIBER

10

11     I, KAREN HARTMANN, a certified Electronic Court

12 Transcriber, certify that the foregoing is a correct transcript

13 from the electronic sound recording of the proceedings in the

14 above-entitled matter.

15

16

17

18

19

20 Karen Hartmann, AAERT CET 475  Date: October 29, 2022

21 TRANSCRIPTS PLUS, INC.

22

23

24

25